UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.                                              **DECISION AND ORDER**
                                                      17-CR-179-RJA
MICHAEL V. SECCHIAROLI,

                            Defendant.

Pending before the Court is Defendant Michael V. Secchiaroli's motion for an order reducing his sentence to time served and releasing him to home confinement pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and as amended by the First Step Act, based on the current COVID-19 pandemic.  (Dkt. No. 44).  His initial motion papers, including a supplemental filing (Dkt. No. 45), were filed *pro se*.  The Government opposed the motion (Dkt. No. 47), and Defendant submitted a reply with counsel (Dkt. No. 52).  The United States Probation Office opposes the motion, as stated in a January 22, 2021 memorandum to the Court that copied in the parties, although the Office declines to make a recommendation based on Defendant's health issues.  For the reasons stated below, Defendant's motion is granted.

## RELEVANT FACTS AND BACKGROUND

On January 17, 2018, Defendant pled guilty before this Court to Count 2 of the Indictment charging a violation of 18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2) (possession of child pornography involving a prepubescent minor).  (Dkt. Nos. 25-26; CM/ECF Minute Entry, Jan. 17, 2018).  He was later sentenced on May 31, 2018 to a term of imprisonment of 72 months, to be followed by 5 years of supervised release.

(Dkt. No. 41 [Judgment]; CM/ECF Minute Entry, May 31, 2018).  Defendant is currently

housed at FCI Fort Dix, and his projected release date is September 14, 2022.[1]  FCI

Fort Dix is a low security federal correctional institution with an adjacent minimum

security satellite camp, located in Joint Base MDL, New Jersey.[2]  Defendant states that

his home detention eligibility date is March 17, 2022, approximately one year from now.

(Dkt. No. 52, p. 3).

Defendant, who is 35 years old, argues that due to his multiple pre-existing

medical conditions, he is vulnerable to severe illness should he contract COVID-19.  He

alleges that he is a former smoker and is morbidly obese, and that he has sleep apnea,

hypertension, and untreated asthma.  Defendant also argues that he tested positive for

COVID-19 on November 5, 2020 and had untreated symptoms.  He further asserts that

cases of COVID-19 reinfection are prevalent, and he seeks compassionate release to

avoid reinfection.  Lastly, Defendant argues that his family responsibilities, in

conjunction with his remorse and rehabilitation, warrant a reduction in his sentence.

In addition to Defendant's alleged health issues, the COVID-19 pandemic has

resulted in a global public health crisis and national emergency.  Fort Dix very recently

experienced a massive COVID-19 outbreak.  For example, the Bureau of Prisons

("BOP") self-reported on January 19, 2021, 321 active inmate COVID-19 cases and 29

active staff inmate cases, out of 2,729 total inmates.  It appears that the outbreak is

---

[1] *See* "Inmate Locator", Federal Bureau of Prisons ("BOP"), https://www.bop.gov/inmateloc/ (last visited Feb. 17, 2021).
[2] *See* "FCI FORT DIX", Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/ftd/ (last visited Feb. 17, 2021).

finally beginning to subside.  As of the date of this ruling, the BOP self-reports 37 active

inmate COVID-19 cases and 37 active staff inmate cases, out of 2,702 total inmates.[3]

"[T]he question of whether compassionate release is warranted during the

pandemic remains a dynamic and fact-intensive inquiry."  *United States v. Franco*, 12-

CR-932, 2020 U.S. Dist. LEXIS 111169, *2-3 (S.D.N.Y. June 24, 2020).

## DISCUSSION

It is the defendant's burden to show that he or she is "entitled to a sentence

reduction under the [compassionate release] statute."  *United States v. Korn*, 15-CR-

81S; 11-CR-384S, 2020 U.S. Dist. LEXIS 62771, *4 (W.D.N.Y. Apr. 9, 2020).  Relief is

proper pursuant to 18 U.S.C. § 3582(c)(1)(A) when the following conditions are met:  (1)

the defendant has satisfied the statutory exhaustion requirement; (2) the Court finds that

"extraordinary and compelling reasons" warrant a reduction of the prison sentence; (3)

the reduction is consistent with the corresponding policy statements issued by the

Sentencing Commission (*see* U.S.S.G. § 1B1.13); and (4) the sentencing factors set

forth in 18 U.S.C. § 3553(a) support modification of the prison term, including whether

the defendant is a danger to the safety of any other person or the community.  *See*

*United States v. Poncedeleon*, No. 18-CR-6094, 2020 U.S. Dist. LEXIS 106890, *1-2

(W.D.N.Y. June 18, 2020).

Under the compassionate release statute, the Court may "reduce the term of

imprisonment and impose a term of probation or supervised release with or without

conditions that does not exceed the unserved portion of the original term of

---

[3] *See* "COVID-19 Coronavirus: COVID-19 Cases", Federal Bureau of Prisons,
https://www.bop.gov/coronavirus/ (updated Feb. 16, 2021); "FCI FORT DIX", Federal Bureau of Prisons,
https://www.bop.gov/locations/institutions/ftd/ (last visited Feb. 17, 2021).

imprisonment." 18 U.S.C. § 3582(c)(1)(A). In considering these elements and factors, "[d]istrict courts have broad discretion in deciding whether to grant or deny a motion for a sentence reduction." *United States v. Tagliaferri*, No. 13-CR-115, 2019 U.S. Dist. LEXIS 205103, *8 (S.D.N.Y. Nov. 25, 2019).

<u>Exhaustion of Administrative Remedies</u>

A motion under the compassionate release statute may be made by either the Bureau of Prisons or the defendant, but if it is the latter, only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A)(i).

The Government argues that Defendant failed to meet the statutory exhaustion requirement because he had yet to file a "proper request" for compassionate release. According to counsel for the BOP, the BOP responded on June 6, 2020 to Defendant's May 18, 2020 request and stated he needed to re-submit his request and identify the "specific category he was moving for relief under", and Defendant never did so. The Government argues that Defendant therefore met neither the delay requirement (i.e. to wait 30 days from a "completed request to the BOP") nor the exhaustion requirement (i.e. receipt of a final administrative decision from BOP's director or general counsel).

Attached as exhibits to the parties' papers are documents illuminating what transpired. In a very comprehensive compassionate release request to the Warden dated May 18, 2020, Defendant discussed "life threatening living conditions" at FCI Fort Dix, as well as his health and medical vulnerability to COVID-19, minimum security

4

classification and sanction-free conduct while incarcerated, minimum risk of recidivism, rehabilitation, and re-entry plan.  (*See* Dkt. No. 44, pp. 27-37; Dkt. No. 47-1, pp. 3-13 [same]).  In response, the BOP stated Defendant did not indicate which "one specific category" of Program Statement No. 5050.50 he wished to be considered under.  (Dkt. No. 47-1, p. 2).  While Defendant's request stated he was not seeking relief under any of the categories of Program Statement No. 5050.50 but rather he sought relief due to potential exposure to COVID-19, he did note United States Sentencing Guideline § 1B1.13 Application Note 1D (the "other reasons" category).  (Dkt. No. 44, p. 29; Dkt. No. 47-1, p. 5 [same]).

Defendant argues that he submitted a duplicate request on October 26, 2020 (*see* Dkt. No. 44, pp. 27-37) and that he did not receive a response to either request as of November 10, 2020.  He further attaches a compassionate release/ reduction in sentence request dated November 13, 2020, where he mentioned his Body Mass Index "BMI" of 52.6 and hypertension, as well as having contracted COVID-19 on November 5, 2020.  He checked off a category of extraordinary and compelling circumstances that was listed on the form, "Medical Circumstances – Debilitated Medical Condition – Illness that has you partially (50%) or completely (100%) disabled."  (Dkt. No. 44, p. 38).

In response to the Government's argument that he failed to exhaust his administrative remedies, Defendant argues that he asked for release multiple times with no response and over 30 days had passed since then, and his request "clearly set out all the information the Superintendent/ Warden needed in order to act on his request . . . the Warden's further statement that more information was needed was simply subterfuge."  (Dkt. No. 52, p. 11).

The Court concludes that Defendant has fulfilled the exhaustion requirement considering the circumstances described above.  He submitted multiple compassionate release requests to the Warden, and at least one is documented as having been received.  That request was more comprehensive and detailed than most of the administrative BOP requests this Court has seen.  Moreover, more than 30 days have passed since any of these requests were submitted to the Warden.

        _Extraordinary and Compelling Circumstances_

The Second Circuit has recently agreed with the majority position of "district courts across the country" that "the First Step Act freed district courts to exercise their discretion in determining what are extraordinary circumstances."  _United States v. Brooker_, 976 F.3d 228, 234 (2d Cir. 2020).  Indeed, "[t]he only statutory limit on what a court may consider to be extraordinary and compelling is that '[r]ehabilitation . . . _alone_ shall not be considered an extraordinary and compelling reason.'"  _Id._ at 237-238 (emphasis in original), quoting 28 U.S.C. § 994(t).[4]

Defendant alleges he has the following high-risk medical conditions that increase his susceptibility to severe illness from COVID-19:  former smoker, morbid obesity, sleep apnea, hypertension, and untreated asthma.

Defendant's BOP medical records from January 2020 through December 2020 are attached to the Government's opposition papers, and records from 2019 and 2020

---

[4] Some district courts argued, before _Brooker_, that two of the application notes to Sentencing Guideline §1B1.13 allow courts to determine that defendants with high-risk medical conditions in the context of the COVID-19 pandemic established "extraordinary and compelling circumstances".  _See_ U.S.S.G. §1B1.13, Application Note 1(A)(ii) (where "defendant is . . . suffering from a serious physical or mental condition . . . that substantially diminishes the ability of defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover"); U.S.S.G. § 1B1.13, Application Note 1(D) (where "an extraordinary and compelling reason other than, or in combination with, the reasons described" in the first three categories of the policy statement exists).

are attached to Defendant's reply papers.  (Dkt. No. 47-2, pp. 2-71; Dkt. No. 52-1, pp. 9-10, 12-31).  The more recent records from late 2020 indicate the following medical conditions:  (1) hypertension (high blood pressure); (2) "severe" substance abuse disorders (i.e. alcohol use, opioid use, cannabis use, and cocaine); (3) gastroesophageal reflux disease ("GERD") without esophagitis; (4) hyperlipidemia (high cholesterol); (5) low back pain; (6) severe obesity, with measurements of 74 inches (6 feet 2 inches tall) and 384 pounds on November 17, 2020, resulting in a BMI of 49.3;[5] (7) sleep apnea; (8) osteoarthritis of knee; and (9) edema (swelling).  (Dkt. No. 47-2, pp. 4-6, 23, 33, 42, 54-56, 69-70).[6]  Defendant is taking medications/ receiving treatments for some of these conditions, including, for example, a CPAP machine for his sleep apnea, Losartan for his hypertension, and compression stockings for his edema secondary to obesity.  (Dkt. No. 47-2, pp. 4, 40).

Thus, despite Defendant's relatively young age, his records show that he has several serious health challenges.

In the records supplied to the Court, however, there is no diagnosis of asthma, despite Defendant's claim that he has "untreated asthma."  Rather, he has had at least one acute respiratory illness, i.e. bronchitis.  (Dkt. No. 47-2, p. 33, 34-36).  As to Defendant's claim that he is a former smoker, Defendant's medical records and presentence investigation report reveal an extensive history of substance abuse

---

[5] See "Adult BMI Calculator", Centers for Disease Control and Prevention, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited Feb. 16, 2021).

[6] At the time of sentencing, as corroborated by Defendant's mother, at least some of these medical issues were reported, with Defendant reporting having been diagnosed with high cholesterol and high blood pressure, as well as suffering a serious injury to his back in 2001 and resultant back pain stemming from his injury.  (Dkt. No. 38, ¶¶ 84-85 [revised presentence investigation report, filed May 25, 2018]). Defendant's height and weight were reported as 6 feet 1 inch and 340 pounds, respectively.  (Dkt. No. 38, p. 2).

including using marijuana and crack cocaine, but nothing regarding cigarette smoke that is the subject of the Centers for Disease Control and Prevention's ("CDC") guidance. The CDC states that "[b]eing a current or former cigarette smoker increases your risk of severe illness from COVID-19".  In fact, Defendant's medical records belie Defendant's claim that he is a former smoker.  (Dkt. No. 47-2, pp. 4 ["Pt denies tob abuse"], 13 ["Pt denies tob abuse"]; *see* Dkt. No. 38, ¶¶ 92-100).

While it is possible Defendant suffers from medical conditions or a medical history not documented by the BOP, the Court cannot conclude without supporting evidence that Defendant has shown that he is a former cigarette smoker or that he has "moderate-to-severe" asthma or another respiratory condition that the CDC concludes places or "might" place him at an increased risk of severe illness.  *See e.g. United States v. Batista*, 2020 U.S. Dist. LEXIS 193155, *8-9 (S.D.N.Y. Oct. 19, 2020) (denying motion where the defendant was a former smoker "although it [was] not clear whether [her] history as a smoker involved cigarettes, which are the subject to the CDC's guidance, or marihuana."); *United States v. Elliott*, 2020 U.S. Dist. LEXIS 136583, *3, 10-13 (E.D.N.Y. July 31, 2020) (denying motion where the defendant cited, among other things, his "long history as a cigarette smoker", respiratory issues, and shortness of breath, but his medical records did not support those claims) (collecting cases).

Even so, Defendant's obesity and hypertension place him at a heightened risk for illness or death should he contract COVID-19.  According to the CDC, any adult with "Severe Obesity" (i.e. BMI greater than 40) is at an increased risk for severe illness from the virus that causes COVID-19, and any adult with hypertension "might" be at an increased risk.  Indeed, the CDC has also stated that "[t]he more underlying medical

conditions someone has, the greater their risk is for severe illness from COVID-19".[7]  In addition, Defendant includes as an attachment to his reply papers information from the CDC regarding how obesity can worsen outcomes from COVID-19, stating that "[a]s BMI increases, the risk of death from COVID-19 increases."  Dkt. No. 52-1, pp. 33-36. Note, however, that neither sleep apnea nor high cholesterol are on the CDC's list.

The Government states that it "acknowledges that the defendant's obesity and smoking, standing alone, presents [an] extraordinary and compelling reason to allow for compassionate release" (it is unclear whether the Government has other medical records confirming Defendant is a former smoker).  (Dkt. No. 47, p. 5).  Nevertheless, it appears that the Government also argues Defendant has not met this requirement because of the efforts made by the BOP and FCI Fort Dix during this pandemic.  The Government states, "[t]aken together, these measures should sharply mitigate the risks of COVID-19 transmission that the defendant purportedly fears".  (Dkt. No. 47, p. 8).  It further argues Defendant's medical records show he is receiving appropriate medical care for his conditions, including his obesity, and Defendant and his entire housing unit have fully recovered from COVID-19 and Defendant twice tested negative for the virus.

The medical records confirm that Defendant tested positive for COVID-19 in early November 2020.  A chest x-ray and EKG were ordered due to his cough, chest pain, shortness of breath, and headache, as well as a cough suppressant and Tylenol.  It was also noted he had a loss of taste and smell, fatigue, a sore throat, body aches, and intermittent dizziness.  (Dkt. No. 44, p. 25; Dkt. No. 47-2, pp. 10-11, 13, 16-17, 57-68).

---

[7] *See* "Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions", Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Feb. 3, 2021); *see also* Dkt. 52-1, pp. 37-49 (same, but updated Dec. 29, 2020).

Defendant's positive, confirmed case of COVID-19 was deemed "resolved" on December 3, 2020.  (Dkt. No. 47-2, p. 71).

In addition to the symptoms documented in his medical records, Defendant alleges that he also experienced burning in his extremities, extremely high blood pressure, an irregular heartbeat, congestion, and chills.  Defendant argues that he received no medical care for his illness except for having his vital signs checked once per day, and he disputes that he was "asymptomatic" on November 5, 2020 as noted in the records.  (Dkt. No. 44, p. 25).  Defendant alleges that his infection has caused "irreparable harm" and that the BOP and FCI Fort Dix were negligent and deliberately indifferent by failing to mandate daily testing for correctional officers and staff and failing to enforce those individuals to consistently wear masks.

Moreover, Defendant argues that the BOP cannot control the virus among inmates and staff or protect more medically vulnerable inmates like Defendant.[8]  He alleges that social distancing is impossible at FCI Fort Dix, and inmates are not supplied with viable Personal Protective Equipment.  According to Defendant, this was the second outbreak at FCI Fort Dix with his building having a 95% positive infection rate; as of January 18, 2021, there were over 700 active, confirmed cases of the virus at FCI Fort Dix and related issues with access to medical care due to the "explosion" of cases.

As noted above, the BOP's self-reported numbers of active COVID-19 cases confirm that FCI Fort Dix was experiencing a colossal outbreak last month and still has confirmed positive cases.  The Court is aware that this data may not even account for

---

[8] *See* Dkt. No. 45 (Nov. 9, 2020 letter to Director of the BOP from two U.S. Senators regarding the lack of adequate testing at FCI Fort Dix, the number of infected inmates and staff, and improper transfers of COVID-19 positive inmates to FCI Fort Dix from other institutions).

asymptomatic transmission of the virus.  Thus, the extent of the outbreak further

supports the conclusion that Defendant has presented "extraordinary and compelling

reasons" for early release.

Last, Defendant argues that he has rehabilitated himself and that he has

accepted full responsibility and is remorseful for his actions.  He states that he has

completed a 20-hour drug education program, a 40-hour Residential Drug Abuse

Program, and over 1,000 UNICOR hours.  He has worked on his sobriety, attended

church, maintained constructive hobbies, and associated only with positive individuals.

According to Defendant, he has maintained clear conduct during his incarceration and

has remained sanction free, and he was scored low on an assessment that indicates

risk of recidivism.  (Dkt. No. 44, p. 39 ["Low" overall male pattern risk level]).  The

Government does not contest any of these statements.

Defendant further states his desire to reside with his mother, Camille Mercurio, at

58 Edgewood Avenue, Buffalo, New York 14223, where he can self-quarantine for 14

days.  This is his pre-incarceration address, which the United States Probation Office

determined at a home inspection on January 21, 2021 continues to be appropriate.

(Dkt. No. 38, p. 2 and ¶ 74).  His proposed re-entry plan includes seeking and securing

employment and medical care with his former doctors.  He also argues that he has a

wife and a young daughter who depend on him.[9]  The impact of the COVID-19

pandemic on Defendant and his family is, unfortunately, not unique.  Thus, his

professed responsibility to his family alone would not warrant a finding of extraordinary

---

[9] Defendant maintained regular contact with his wife and daughter prior to his incarceration even though he did not reside with them.  (Dkt. No. 38, ¶¶ 79-80).  A notation in the record, however, does make the Court question that claimed dependency considering Defendant stated he was in the middle of divorce proceedings.  (Dkt. No. 47-2, p. 26).

and compelling circumstances here.  There are surely many inmates who also face
such difficulties.

However, the aforementioned factors combined, particularly Defendant's medical
issues, the severe outbreaks at FCI Fort Dix, and Defendant's rehabilitation efforts all
support a sentence reduction for Defendant.  As to Defendant's "recovery" from COVID-
19, even though Defendant previously contracted the virus and presumably would have
some degree of immunity, it is conceivable that he could be re-infected and experience
a severe case of COVID-19.  Much is currently unknown about COVID-19 reinfection or
how long immunity lasts.

### 18 U.S.C. § 3553(a) Factors and Dangerousness

The Government argues that it is opposed to Defendant's release because the §
3553(a) factors weigh against a reduction in sentence and because Defendant presents
a danger to others and the community.[10]  The Government notes Defendant's admitted
sexual interest in minor children in addition to the offense conduct.  The Court
appreciates the Government's position in opposition to Defendant's release, as
Defendant was convicted of a serious crime.  However, the totality of the circumstances
presented here render release appropriate.

Assuredly, Defendant's offense conduct was atrocious.  He knowingly obtained
images of child pornography from the internet and stored them on his computer and
viewed them.  Some of these images depicted pre-pubescent children, and some of the

---

[10] The § 3553(a) factors include the nature and circumstances of the offense and the history and
characteristics of the defendant, as well as the need for the sentence imposed to (1) reflect the
seriousness of the offense, promote respect for the law, and provide just punishment; (2) afford adequate
deterrence; (3) protect the public from further crimes of the defendant; and (4) provide the defendant with
needed training and treatment in the most effective manner.  *See* 18 U.S.C. § 3553(a).

pornography contained sadistic or masochistic conduct, or other depictions of violence. (Dkt. No. 25 [Plea Agreement], ¶ 6; Dkt. No. 38, ¶¶ 11-23).  Moreover, Defendant admitted that he was physically attracted to females ages 13-17 and fantasized about having sexual contact with minor females, and that he previously had conversations that involved topics of a sexual nature with a female who told him she was 11 years old (he stated he suspected she was actually an adult).  (Dkt. No. 38, ¶¶ 18, 20-22, 32-33).

Nevertheless, Defendant denied ever taking any photographs of minors or engaging in sexual conduct with a minor, and there was no evidence of Defendant having had sexual contact with a child.  He immediately and voluntarily enrolled in long-term sex offender treatment following the search warrant at his residence and expressed genuine remorse for his conduct.  (Dkt. No. 38, ¶¶ 33-34, 88).  Defendant was assessed at his sentencing at United States Sentencing Guidelines Criminal History Category I, with no prior criminal history.  (Dkt. No. 38, ¶¶ 52-56).

Defendant has also completed a substantial period of incarceration, which the Government concedes.  He demonstrated "satisfactory" adjustment to supervision and was compliant with the conditions of his pretrial release, including electronic monitoring via home incarceration for approximately a year and a half.  (Dkt. No. 38, ¶ 10).  At sentencing, the Court granted Defendant's request for voluntary surrender to the BOP. (*See* CM/ECF Minute Entry, May 31, 2018).

In sum, the fact that Defendant has served the majority of his sentence, coupled with the very severe risk to his health and safety should he contract COVID-19 again, strongly weighs in favor of release.  The Court's decision to release Defendant approximately 19 months early from a 72-month sentence to protect Defendant's life

13

and health during a global pandemic is highly unique, especially considering his confluence of medical issues, and will not undermine general deterrence.  Moreover, because of this extraordinary and unprecedented health crisis and Defendant's very serious health issues, it cannot be said that the substantial amount of time Defendant has already spent in prison was not a just punishment.  The Court finds that the § 3553(a) factors do not outweigh the extraordinary and compelling circumstances presented here, and that compassionate release would not "undermine the goals of the original sentence".  *United States v. Ebbers*, 432 F. Supp. 3d 421, 430-431 (S.D.N.Y. 2020).

The Court also finds that Defendant's recidivism is unlikely because his health conditions and risk of infection during the pandemic will limit his mobility and ability to interact with others.  Moreover, Defendant has submitted a portion of the report that was submitted with his sentencing memorandum, from the sex offender treatment specialist and forensic counselor he saw since March 2016.  (Dkt. No. 52-1, pp. 2-8; *see also* Dkt. No. 36-2]).  The report noted Defendant's commitment to his treatment, his cooperation and engaged behavior, and the fact that he "does *not* possess a number of risk factors empirically associated with high recidivism risk."  (Dkt. No. 52-1, p. 6 [emphasis in original]).  The expert also concluded that Defendant is in a "below average" risk category for sexual recidivism and opined that said risk could "continue to be managed in the community with standard conditions of probation/court supervision and sexual offender specific treatment."  (Dkt. No. 52-1, pp. 5-6).

Dangerousness is further mitigated by the fact that the Court will release Defendant to home incarceration for the remainder of the time he was to be

14

incarcerated, followed by the previously ordered 5 year period of supervised release, which will allow him to pursue treatment for his medical conditions and minimize his heightened exposure to serious complications or a risk of death from COVID-19.  For these reasons, the Court does not find that Defendant's release will present a danger to the safety of any other person or the community.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for release is granted and Defendant shall be released from the custody of the Bureau of Prisons.  Upon release, he shall be subject to a period of home incarceration for the remaining term of imprisonment, the details of which will be set forth in a separate order.  Following this period of home incarceration, Defendant will be placed on supervised release for a term of 5 years, and he shall be subject to all standard and special conditions of supervised release stated in the original judgment and sentence in this case.


**IT IS SO ORDERED.**

_s/Richard J. Arcara_
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT


Dated:  February 17, 2021
        Buffalo, New York